Sanjay Wadhwa
George N. Stepaniuk
Todd Brody
David C. Austin
Chevon Walker
Attorneys for Plaintiff
U.S. SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0080 (Brody)

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
_____

|  |  |  |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | Civil No. |
| Plaintiff, | : | |
| -against- | : | ECF CASE |
| BRIAN HIRSCH and JOSEPH SPERA, | : | COMPLAINT AND JURY DEMAND |
| Defendants. | : | |

_____

Plaintiff Securities and Exchange Commission ("Commission") alleges the following

against defendants Brian Hirsch ("Hirsch") and Joseph Spera ("Spera") (collectively,

"Defendants"):

## SUMMARY OF ALLEGATIONS

1.     This case involves a fraudulent scheme in which Hirsch, then a registered

representative consecutively associated with two major broker-dealer firms, gave preferential

access to hundreds of initial and secondary public offerings to Spera and at least one other

brokerage customer ("Customer A"), in exchange for undisclosed cash kickbacks.  Hirsch was a

member of the wealth syndicate desk at both broker-dealer firms and was entrusted with

determining offering allocations for certain groups of their retail customers.  While at both firms, Hirsch had an arrangement with Spera and Customer A in which they paid Hirsch cash kickbacks equal to a percentage of the secondary market trading profits they made on the offering stock that Hirsch allocated to them – 24 percent for Spera and 25 percent for Customer A.  In exchange, Hirsch gave them preferential access to, and greater allocations of, public stock offerings marketed by his employers for their issuer clients.  In most instances, Spera and Customer A sold the stock into the market as soon as possible, often turning a substantial profit.

2.    Through their scheme, the Defendants and Customer A defrauded the brokerage firms that employed Hirsch by using deception to subvert the firms' allocation policies and procedures so as to enable Spera and Customer A to gain greater access to lucrative offerings at the expense of the firms' other brokerage customers and the issuers' interests in raising capital from long-term investors.  The scheme thereby enabled Hirsch to line his own pockets by secretly sharing in the trading profits in violation of his obligations to his employer.

3.    In breach of his contractual duties, Hirsch failed to disclose the cash kickbacks or anything at all about his arrangements with Spera and Customer A to either brokerage firm that employed him.  To further the scheme, Hirsch also made affirmative written representations to both brokerage firms that were materially false in light of his undisclosed arrangements with Spera and Customer A, including false representations in quarterly and annual ethics certifications that Hirsch (i) had no undisclosed conflicts of interest with respect to his employment at the firm; (ii) had not entered into any *quid pro quo* arrangements with respect to offering allocations, which were expressly prohibited by firm policy; and (iii) had not received or solicited any prohibited or undisclosed gifts, including cash.

4.       Customer A also made materially false statements to further the scheme when receiving initial public offering ("IPO") allocations through Hirsch by falsely certifying to Hirsch's firm that no restricted person held a prohibited beneficial interest in Customer A's account, and Spera failed to disclose that his previously executed certification to that effect was rendered false once the scheme began.  Absent such a certification, Spera and Customer A would have been ineligible to purchase any of the IPO shares that Hirsch allocated to them pursuant to their scheme.  They were, in fact, ineligible to purchase any of those shares and those certifications were false, because Hirsch was a restricted person as defined in the certification form, which defined beneficial interest as any "economic interest, including the right to share in gains or losses."  Hirsch, too, failed to disclose his interest in those accounts and transactions in his periodic ethics certifications to the firm, which required disclosure of each brokerage account and securities transaction in which he had a beneficial interest.

5.       Spera made approximately $4 million in trading profits on the offering allocations he received from Hirsch, and Spera paid Hirsch approximately $1 million in cash based on those profits.  Customer A paid Hirsch a total of over $200,000 pursuant to their kickback arrangement in exchange for offering allocations from Hirsch.

6.       By virtue of the conduct alleged herein, (a) Hirsch and Spera, directly or indirectly, singly or in concert, violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and (b) Hirsch is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and abetting Spera's and Customer A's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

7.      Unless Hirsch and Spera are permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

8.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d)(1) of the Exchange Act [15 U.S.C. § 78u(d)(1)] and seeks to restrain and permanently enjoin the Defendants from engaging in the acts, practices, transactions and courses of business alleged herein.  In addition, the Commission seeks a final judgment (a) ordering the Defendants to disgorge their ill-gotten gains, together with prejudgment interest thereon; and (b) ordering Hirsch to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

9.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act [15 U.S.C. § 78aa].  Certain of the events constituting or giving rise to the alleged violations occurred in the District of New Jersey, including the transfer of funds used to make kickback payments to Hirsch that are at issue in this case.

11.      In connection with the conduct alleged in this complaint, the Defendants, directly or indirectly, singly or in concert, have made use of the means or instrumentalities of interstate commerce or of the mails, or of the facilities of a national securities exchange.

## THE DEFENDANTS

12.      **Hirsch**, age 42, resides in Melville, New York.  From September 2008 through December 2015, Hirsch was a registered representative associated with Firm A, a registered

broker dealer and, at that time, investment adviser with offices in New York City, and worked on that firm's wealth syndicate desk, which Firm B, also a dually-registered broker-dealer and investment adviser with offices in New York City, acquired from Firm A in December 2015. Hirsch continued performing the same services for Firm B, until his resignation in December 2017. Throughout the relevant period, Hirsch held Series 7 and 63 securities licenses.

13.     **Spera**, age 56, is a former day trader who resides in Boca Raton, Florida. On December 11, 2017, Spera was charged by the Commission in an unrelated civil action alleging insider trading violations of the federal securities laws, and he also pled guilty on that date to parallel criminal charges alleging insider trading filed by the U.S. Attorney's Office for the District of New Jersey.

## RELEVANT INDIVIDUAL

14.     **Customer A** is a stock trader who resides in New York. He was a registered representative at several broker-dealers from 1989 through 2006. During the time he was a registered representative, Customer A's securities license was suspended by the New York Stock Exchange and withdrawn or revoked in multiple states.

## THE DEFENDANTS' FRAUDULENT CONDUCT

### Background

15.     Publicly traded issuers have a number of ways to raise funds. One way is through a public offering of securities. When an issuer whose securities are not yet publicly traded conducts a public offering of securities, such an offering is commonly referred to as an initial public offering or "IPO." When an issuer whose securities are already publicly traded conducts an offering of additional securities, such an offering is commonly referred to as a secondary or follow-on offering (referred to hereinafter as a "secondary offering").

16.     In an offering, an issuer typically offers to sell a set number of new shares at a set price to private investors or to the general public and retains one or more investment banking firms to market the offering, a function commonly referred to as underwriting.  An investment banking firm may purchase a set number of shares from the issuer up front at a set price and then try to resell the shares to private or public investors.  An offering underwritten in this manner is commonly referred to as being done on a "firm commitment" basis.

17.     During the relevant period, Firm A and Firm B both engaged in the business of underwriting IPOs and secondary offerings for issuers.  As part of the offering process, Firm A and Firm B allocated the available shares to interested investors.  Many of the offerings at issue here, which included the vast majority of the numerous IPOs that Firm A and Firm B underwrote during the relevant period, provided lucrative investment opportunities and were highly sought after by investors, both as long-term investments and, in part, due to the potential for profitable trading opportunities on the secondary market.  While certain secondary offerings were attractive to investors for these reasons, some were less desirable, in part because the dilutive impact of a secondary offering might temporarily depress market prices for the stock.

**Hirsch's Responsibilities In Allocating Offering Shares**

18.     As a member of the wealth syndicate desk, first at Firm A and then at Firm B, Hirsch's responsibilities included soliciting indications of interest from the firm's brokerage customers and allocating shares among interested customers for offerings underwritten by the firm, generally on a firm commitment basis as lead or joint "book runner" on the offering.

19.     For example, Firm A's capital markets group would typically provide a certain number of shares to be allocated by Hirsch's group.  Hirsch's supervisors entrusted him, subject to occasional review, to then allocate those shares among the group's customers in accordance

6

with the firm's allocation policies, which provided specific criteria and guidance to ensure that the issuers' and the firm's interests were being advanced.  The issuer's interests were paramount and, subject to that consideration, key customers with more capital for long-term investments and that did more overall business with the firm were generally expected to receive more shares than other types of customers.  Hirsch continued this work at Firm B under the same supervisor.

**The Firms' Written Allocation Policies and Procedures**

20.     Firm A and Firm B had written policies and procedures that set forth specific allocation principles, rules and criteria that Hirsch was required to follow.  Firm A's global allocation policy articulated the primacy of the issuer's interests and preferences, as follows: "All allocations should be made with an emphasis on the Issuer's allocation preference (if any). Exceptions may be agreed upon only with the Compliance department on a case-by-case basis." Additional factors that were to be considered by the wealth syndicate desk at Firm A included the following:

- The investor client's account history and overall business relationship with the firm;
- The investor client's nature and level of demonstrated interest in the Offering or Issuer, including participation in road shows and timeliness of indications of interest;
- Whether the investor client owns similar securities in its portfolio and/or trades comparable securities, including the investor client's historic and existing position in the Issuer's securities and the investor client's interest in the Issuer's industry sector;
- Whether Syndicate believes the investor client intends to hold the securities as an investment, or, instead, expects to sell the securities in the immediate aftermarket; and
- The investor client's desired long-term position in the security being offered or in the relevant industry, and the price or prices at which the investor client might accumulate that long-term position.

21.     At Firm A, both the global allocation policy and the syndicate desk's standard operating procedures also expressly prohibited certain allocation practices that gave rise to conflicts of interest with the firm or the issuer, including any "predetermined agreement or *quid pro quo* arrangement with an investor client in return for an allocation, including the promise to

allocate in a future offering of a different issuer."  The standard operating procedures also expressly prohibited "cross-selling," defined as "promising an allocation of an oversubscribed syndicate offering in exchange for the client purchasing an offering that is undersubscribed."

22.     Firm B's policies and procedures applicable to equity offerings also expressly prohibited "*quid pro quo* allocations" during the time Hirsch worked at Firm B.  In a section titled "Prohibition on Abusive Allocation Arrangements," the relevant policy manual, which governed the performance of functions of employees involved in offerings and allocations, stated that Firm B:  (i) "does not allocate a new issue as a means of obtaining a 'kick back' from the recipient in the form of excessive compensation for other services offered" by the Firm; and (ii) "does not offer . . . shares [Firm B] allocates of a new issue as consideration or inducement for the receipt of compensation that is excessive in relation to the services provided."  The manual goes on to state that this "provision prohibits *quid pro quo* activity, not only with respect to trading services, but any service offered by" Firm B.  The manual further provided that other, "generally accepted criteria" were to be used instead "in determining the allocation of public offerings," such as "the length of a client relationship" and the "size of a client's account."

23.     As detailed below, Hirsch breached his obligations to his employers and betrayed his employers' trust by secretly entering into prohibited *quid pro quo* arrangements with two of his desk's customers, Spera and Customer A, whereby he agreed, contrary to the firms' allocation policies, to give them preferential access to offerings and increase their allocations in exchange for cash payments equal to a substantial percentage of the aftermarket trading profits generated by those offering allocations.

**Hirsch's Undisclosed Kickback Scheme With Spera**

24.    From approximately January 2012 through November 2015, Hirsch gave Spera preferential access to offerings marketed by Firm A and larger allocations in exchange for 24% of the aftermarket trading profits in accounts held or controlled by Spera.  The percentage was determined with the applicable tax rate in mind so as to give Hirsch approximately 50% of Spera's net post-tax trading profits.  At Hirsch's request, Spera's payments were made in cash installments of just under $10,000, typically delivered to Hirsch outside his office or in public places such as bars and restaurants.  Hirsch instructed Spera not to give him more than $10,000 at one time so that it would fit in an envelope inside his jacket, and to avoid scrutiny at the banks from which the withdrawals were made.  In exchange for receiving greater access to over-subscribed offerings, such as lucrative IPOs, Spera agreed that he would also participate in less desirable, under-subscribed secondary offerings.

25.    Spera maintained a document that detailed all the offering allocations he received from Hirsch, identified as "Phantom" at the top of the report, and the corresponding trading profits during the course of their arrangement.  The "Phantom" report includes 443 separate stocks and a total of 1,541 allocations from January 5, 2012 through November 19, 2015.  The report shows a total pre-tax profit of approximately $4.44 million after fees and commissions. During this period, a total of at least $945,000 in wire transfers were made between accounts to initiate the cash payments to Hirsch.  Spera wired the money from his trading account to several bank accounts from which the cash was withdrawn, typically in amounts less than the $10,000 threshold that would result in a currency transaction report, and then delivered to Hirsch.  Hirsch used some of the cash to pay contractors working on his house and kept the remainder in a safe deposit box or otherwise used the cash for other purposes.

26.     As Hirsch knew, Spera quickly sold the shares on the secondary trading market to generate the trading profits they shared.  Pursuant to their kickback arrangement, Hirsch gave Spera more offering allocations, including allocations in more desirable offerings, and a larger number of shares in offerings than Spera would have otherwise received.  In addition, Spera not only received more frequent, better and larger allocations, but he also was given preferential access to offerings that otherwise went principally to institutional clients, including large public pension funds.  The additional allocations and shares that Hirsch gave to Spera pursuant to their arrangement came at the expense of other customers, who would have otherwise received larger and more frequent allocations, and also at the expense of the issuers, who typically preferred to have their shares allocated to larger, more established long-term investors that would hold the stock, rather than a day trader like Spera who would sell the shares as soon as possible.

27.     After Hirsch's group moved to Firm B in December 2015, he and Spera continued their kickback arrangement, with Spera delivering cash to Hirsch and discussing the arrangement with him outside Hirsch's office at Firm B.

**Hirsch's Undisclosed Kickback Scheme With Customer A**

28.     Hirsch's arrangement with Customer A began in 2013, when Hirsch was still at Firm A, and continued after Hirsch moved to Firm B.  At some point in 2013, Hirsch and Customer A discussed entering into a *quid pro quo* arrangement of the same nature as Hirsch's arrangement with Spera.  After Hirsch then began increasing Customer A's allocations and giving him preferential access to IPOs and other lucrative offerings, Customer A began paying Hirsch 25% of his pretax aftermarket trading profits on a monthly basis in cash.  Customer A's payments to Hirsch, and the preferential allocations he received from Hirsch, continued throughout the period from 2014 through 2016.  When Hirsh moved to Firm B, their scheme

continued.  Hirsch received over $200,000 in cash from Customer A through 2016, and Customer A made additional cash payments to Hirsch in 2017 pursuant to their arrangement.

29.     Like Spera, Customer A understood the impropriety of his kickback arrangement with Hirsch, the risk it presented to Hirsch in his employment, and the need for confidentiality to prevent Hirsch's employer from learning about the arrangement.

30.     Pursuant to their kickback arrangement, Hirsch gave Customer A more offering allocations, including allocations in more desirable offerings, and a larger number of shares in offerings than Customer A would have otherwise received.  Beginning in 2013, Hirsch allocated offering shares to Customer A in at least 268 separate stocks, for a total of at least 758 separate allocations.  As Hirsch knew, Customer A generated his trading profits by promptly selling the shares on the secondary trading market to generate the trading profits they shared.  As with Spera, the additional allocations and shares that Hirsch gave to Customer A came at the expense of other customers and the issuers.

**Hirsch's Misrepresentations to Firm A and Firm B**

31.     Hirsch knew that his kickback arrangements with Spera and Customer A were expressly prohibited by applicable policies at both Firm A and Firm B.  Hirsch did not disclose the arrangements even though he knew that he was required to do so under the firms' policies and procedures governing conflicts of interests and offering allocations.  Instead, Hirsch repeatedly, and knowingly, made materially false statements in periodic certifications, in which he falsely attested to his compliance with the multiple policies prohibiting such arrangements and other forms of prohibited or undisclosed payments giving rise to conflicts of interest with the firm and its clients.  Hirsch's false statements to Firm A and Firm B are detailed below.

**Misrepresentations to Firm A**

32.     Since no later than 2013, Firm A required all covered employees, including Hirsch, to attest in writing in quarterly and annual certifications to their compliance with its global conflicts of interest policies, including each of its component policies.  Hirsch made multiple false statements in each such certification he provided from 2013 until his departure from Firm A in December 2015.

33.     The conflicts of interest policies had several facets, each of which was addressed in the periodic certification.  The certification language and mechanics of the certification process changed during the relevant period, as a previously manual process gradually moved online.  In each relevant instance, however, Hirsch falsely certified, either manually or electronically, that he had complied with each of the relevant policy components listed in the certification.  For example, his certification for the second quarter of 2013, which he signed manually on July 23, 2013, stated as follows above the signature line:  "I certify that I have disclosed all existing and potential conflicts of interests . . . as they relate to my employment at [Firm A].  **Should any additional conflicts of interest arise, I agree to promptly notify [the applicable compliance personnel]**.  I understand that a willful misstatement or omission of information requested on this Form constitutes a violation of the *Compliance Policies and Procedures*."  (Emphasis in original.)

34.     One element of the conflicts of interest policy that was in effect during the relevant period addresses conflicts that "may not be manageable," including employee-client conflicts.  The written policy provides examples of such conflicts, including the following: "Where an employee or representative of the firm puts his/her own interest ahead of the interests of the firm (e.g., where [an employee] executes a transaction, without seeking the necessary

approvals, for the purpose of making a profit that might result in increased remuneration for that [employee]).”  Employees were required to disclose and consult with compliance about any potential or actual conflicts of interest.  Hirsch's undisclosed kickback arrangements with Spera and Customer A posed such a conflict, as Hirsch was putting his own interests ahead of the firm's interests by increasing their allocations for the sole purpose of enabling them to make a trading profit that would result, by virtue of the kickbacks, in increased income for Hirsch, and doing so in direct contravention of his firm's allocation policies.

35.     The overall conflicts of interest policy also specified that it was to be read in conjunction with a number of other policies applicable to particular lines of business, which were listed in an appendix to the global conflicts of interest policy document.  The appendix included the global allocation policy, which (as discussed above) expressly prohibited the very type of *quid pro quo* arrangement that Hirsch had with Spera and Customer A.  Accordingly, Hirsch also falsely attested to compliance with the global allocation policy each time he executed his periodic conflicts of interest certification.

36.     Another component of the periodic conflicts of interest certification was the global gifts and entertainment policy, which reinforced and intertwined with the other global policies in this area.  Hirsch's certifications also falsely attested to compliance with this policy. The gifts and entertainment policy expressly stated that "giving, accepting or otherwise engaging in the following activities [among others] is prohibited:

- Cash or cash equivalent[s];
- Gifts or Entertainment that could or could be perceived to bring [Firm A] into disrepute;
- Gifts or Entertainment giving rise to a perceived or actual conflict of interest;
- Gifts or Entertainment without a legitimate business purpose;
- Soliciting Gifts or Entertainment from a Business Contact;
- Gifts or Entertainment that may be deemed to be offered in exchange for pending or anticipated business;

- Gifts or Entertainment which otherwise might, or might be seen to, influence the recipient to act improperly or contrary to the recipient's duties to his/her employer;
- Activities or conduct deemed to be contrary to applicable law, including anti-bribery and anti-corruption laws, rules or regulations (e.g., kickbacks, corrupt payments); and
- Gifts or Entertainment in breach of this or any other firm policy.[1]

37.     The cash payments from Spera and Customer A fell within each of these prohibited categories.  Each of Firm A's applicable gifts and entertainment policies in effect during the relevant period also required employees to report all gifts to compliance and required pre-approval from supervisors and compliance for gifts over the local equivalent of £40.  Hirsch did not do so when certifying that he had complied with these policies.

38.     An additional component of the periodic conflicts of interest certification required Hirsch to attest to compliance with the global personal investments policy, which mandated, among other things, disclosure of all reportable accounts and each securities transaction in such accounts.  Hirsch was also subject to a periodic reporting requirement that required him to certify compliance with an identical policy applicable to his group.  Under both policies, the definition of reportable accounts, set forth in the certification forms he executed and elsewhere, included any brokerage account in which the employee has an interest.  Because he had an interest in the accounts held by Spera and Customer A, including the accounts held away from Firm A that were used for the aftermarket trading, and did not disclose those accounts or report the securities transactions made in them, Hirsch's certifications during the relevant period also falsely attested to compliance with these policies.

---

[1]     Firm A also maintained a gifts and entertainment policy that was specifically applicable to Hirsch's group, and which also prohibited "Gifts or Entertainment which otherwise might, or might be seen to, influence the recipient to act improperly or contrary to the recipient's duties to his/her employer" and "Gifts or Entertainment that may be deemed to be offered in exchange for pending or anticipated business."

39.     Finally, the periodic conflicts of interest certification, both firm-wide and specifically applicable to Hirsch's group, required Hirsch to attest to compliance with the global outside affiliations policy.  Outside affiliations were broadly defined in the policy, with non-exhaustive examples that included one's "own business venture" and any "other activities relevant to the interests of the firm."  The policy provided that outside affiliations must not compromise the employee's duties to Firm A and required employees to disclose to compliance, and seek pre-approval for, all outside affiliations.  Hirsch's kickback arrangements with Spera and Customer A qualified as a business venture or activity that was plainly relevant to the interests of the firm and compromised Hirsch's duties to Firm A – indeed, its purpose was to secretly advance Hirsch's own financial self-interest at the expense of Firm A' interests and those of its other brokerage customers and issuer clients.

**Misrepresentations to Firm B**

40.     Firm B required all covered employees, including Hirsch, to make similar disclosures and certifications as Firm A.  After Hirsch joined Firm B, he was required to respond in writing to a "New Associate Compliance Questionnaire" that covered multiple policies applicable to all Firm B employees, including relevant policies laid out in Firm B's compliance manual and Code of Ethics.  Hirsch submitted his response to Firm B attesting to his purported compliance with those policies on February 25, 2016, even though he knew that his kickback arrangements with Spera and Customer A were ongoing at that time.  In his response, Hirsch stated that "at the time of this submission I have made all required, relevant disclosures referenced throughout this questionnaire and, as a result, I am currently in compliance with all applicable policies referenced herein."  As Hirsch knew, that statement was false, because he did

not disclose anything at all to Firm B about his kickback arrangements with Spera and Customer A and, as a result, was in violation of multiple policies referenced in the questionnaire.

41.     In addition to violating the express prohibition on *quid pro quo* arrangements, Hirsch falsely attested in the response to the questionnaire to his compliance with Firm B's policies governing employees' conflicts of interest, outside income or gifts and interests in securities accounts.  Firm B's Code of Ethics, which the questionnaire referenced, has a detailed conflict of interest policy that provides, among other things, that a conflict may arise when an employee "has a financial . . . incentive to favor the interest of one client or group of clients over another client" or when the the employee has an "interest [that] differs or is perceived to differ with the interests of the firm."  The policy clearly states that "[a]ctions or relationships that may create personal conflicts of interest must not be undertaken without prior approval of the firm," and that "[a]ssociates must notify their supervisors or the Compliance Department of information that relates to an actual, potential or perceived conflict that has not already been addressed."  Hirsch's kickback arrangements plainly gave him the financial incentive to favor Spera and Customer A over other firm customers and over the firm's interests when allocating offering stock, yet he failed to obtain the firm's prior approval for those arrangements or to notify anyone about them.  Accordingly, Hirsch knew that his submission falsely attested to compliance with these policies.

42.     Firm B's Code of Ethics also prohibited employees from accepting or receiving "gifts" or any "similar form of consideration from any person with which" the firm "does business" unless the consideration complies with, among other things, Firm B's policies and "cannot be construed as potentially influencing any business judgment of the [employee's] performance of his or her duties."  For the reasons described above, Hirsch knew that in his

16

submission, he falsely attested to compliance with these policies as well.  In fact, Hirsch

expressly, and falsely, stated in his submission that he did not have reportable outside "sources

of income," even though he knew that he was receiving cash payments from Spera and Customer

A.

       43.     Hirsch's submission also falsely attested to his compliance with the firm's policy

requiring disclosure of all accounts "where an employee has a personal financial interest" in

which the "employee is directly or indirectly financially interested" or in which the employee has

a "beneficial interest."  Moreover, Firm B's policies governing employee accounts expressly

provided that "employees may not share directly or indirectly in the profits or losses of a

customer's account," except in limited circumstances not present here and only with the prior

approval of compliance.  In fact, in his submission, Hirsch expressly, and falsely, stated that he

did not have any such interests in any brokerage or other account that he had not disclosed or for

which he had not obtained prior approval, even though Hirsch knew he was sharing in the

trading profits of, and therefore had a substantial financial and beneficial interest in, brokerage

accounts held by Spera and Customer A.

**<u>Misrepresentations by Customer A and Spera When Buying IPO Shares</u>**

       44.     Customer A also made materially false statements to further the kickback scheme

when receiving IPO allocations through Hirsch by falsely certifying to Firm A that no restricted

person held a prohibited beneficial interest in Customer A's account.  Similarly, Spera failed to

disclose to Firm A that his previously executed certification to that effect was rendered false

once his scheme with Hirsch began.  Spera provided his certification to Firm A in 2011, just

before his scheme with Hirsch began, and Spera failed subsequently to disclose that his

certification was no longer valid, despite the fact that the certification expressly required him to

notify Firm A if the certification ceased to be true and that Firm A periodically informed account holders in writing that a new certification must be provided if there has been a change in IPO eligibility status. Spera failed to do so. Customer A submitted IPO certifications to Firm A after his scheme with Hirsch had already started, and Customer A's certifications to Firm A were therefore false when made.

45.     As Hirsch knew, such a certification was required in order for a purchaser to be eligible to purchase the IPO shares. The requisite certification form states that the underwriting firm "may not sell or cause to be sold a **new issue** . . . to any account in which a **restricted person** holds a **beneficial interest** unless the account qualifies for a **general exemption** under [FINRA Rule 5130]." (Emphasis added.) As an associated person and employee of a broker-dealer, Hirsch was a restricted person as defined in the certification form, and beneficial interest is defined as any "economic interest, including the right to share in gains or losses." As Hirsch knew, he had a beneficial interest in the Spera and Customer A accounts to which he allocated IPO stock because his kickback arrangements with them entitled him to a share of the gains in those accounts.

46.     None of the general exemptions applied and while a purchaser could still remain eligible if the account holder implemented procedures to reduce the beneficial interests of all restricted persons with respect to new issues to, in the aggregate, below 10%, neither Spera nor Customer A implemented any such procedures, and Hirsch's interest in the accounts (with respect to new issues and otherwise) always remained at the agreed upon pre-tax percentages of 24% (Spera) and 25% (Customer A), well above the 10% threshold. Nevertheless, as Hirsch knew, Spera and Customer A submitted certifications stating that no restricted person held a prohibited beneficial interest in their accounts, thereby certifying their eligibility to purchase IPO

shares, and they never disclosed Hirsch's interests in their accounts.  Those statements were

materially false, and as Hirsch knew, they were therefore ineligible to purchase any of the IPO

shares that Hirsch allocated to them during the course of their scheme due to his interest in their

accounts.

47.     Hirsch was familiar with the IPO eligibility certification requirements because,

among other things, he handled account opening documentation that included the IPO eligibility

certificate and the processing of indications of interest for IPOs.  According to his group's equity

syndicate desk policies at Firm A, during the relevant period, a customer's account opening

application included a reference to the IPO eligibility certificate and required the customer to

attest to eligibility to participate in IPOs.  There was also a stand-alone version of the certificate,

and the customer was required to sign one of the two in order to participate in an IPO.  Hirsch

knew that before he could submit a customer's indication of interest for an IPO, an eligibility

certificate was required to have been submitted and approved by the branch administrative

officer.  Firm A's systems were designed to block an IPO indication of interest if an IPO

eligibility certificate was not on file for that customer.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**
**(Both Defendants)**

48.     The Commission realleges and incorporates by reference herein each and every

allegation contained in paragraphs 1 through 47.

49.     The Defendants, directly or indirectly, singly or in concert, by the use of means or

instrumentalities of interstate commerce, or of the mails, or of facilities of a national securities

exchange, knowingly or recklessly have, in connection with the purchase or sale of securities: (a)

employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts

or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

50.     By reason of the foregoing, the Defendants, directly or indirectly, singly or in concert, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Liability for Spera's and Customer A's Violations of Section 10(b) of the Exchange Act and Rule 10b-5(b) (Hirsch)

51.     The Commission realleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 47.

52.     The Defendants and Customer A, directly or indirectly, singly or in concert, by the use of means or instrumentalities of interstate commerce, or of the mails, or of facilities of a national securities exchange, knowingly or recklessly have, in connection with the purchase or sale of securities: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

53.     As alleged above, Hirsch knowingly or recklessly engaged in fraudulent conduct that resulted in violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule

10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)] by Spera and Customer A with respect to the matters alleged in paragraphs 44-47.

54.     By engaging in the conduct alleged above, Hirsch knowingly or recklessly provided substantial assistance to Spera and Customer A with respect to their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)] in connection with the matters alleged in paragraphs 44-47.

55.     By reason of the foregoing, Hirsch is liable pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)] for aiding and abetting Spera's and Customer A's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5(b) thereunder [17 C.F.R. § 240.10b-5(b)].

## **PRAYER FOR RELIEF**

**WHEREFORE**, the Commission respectfully requests a Final Judgment;

### **I.**

Permanently restraining and enjoining the Defendants from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### **II.**

Ordering each of the Defendants to disgorge all of the unlawful trading profits and all other ill-gotten gains they received from the violations alleged in this complaint, and ordering each of them to pay prejudgment interest thereon;

### **III.**

Ordering Hirsch to pay civil monetary penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; and

## IV.

Granting such other and further relief as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff demands that this case be tried to a jury.


Dated:  New York, New York
        December 19, 2017

Respectfully submitted,


Sanjay Wadhwa*
George N. Stepaniuk*
Todd Brody
David C. Austin*
Chevon Walker
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0080 (Brody)
* Not admitted in New Jersey

## LOCAL RULE 11.2 CERTIFICATION

Pursuant to Local Rule 11.2, I certify that the matter in controversy alleged in the foregoing Complaint is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

_Sanjay Wadhwa_
Sanjay Wadhwa
Senior Associate Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0181

## DESIGNATION OF AGENT FOR SERVICE

Pursuant to Local Civil Rule 101.1(f), because the Securities and Exchange Commission (the "Commission") does not have an office in this district, the United States Attorney for the District of New Jersey is hereby designated as eligible as an alternative to the Commission to receive service of all notices or papers in the above-captioned action.  Therefore, service upon the United States or its authorized designee, Caroline Sadlowski, Chief, Civil Division, United States Attorney's Office for the District of New Jersey, 970 Broad Street, Suite 700, Newark, NJ 07102, shall constitute service upon the Commission for purposes of this action.

Sanjay Wadhwa
Senior Associate Regional Director
Counsel for Plaintiff
U.S. Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0181